Carl Merton IRONS, II, Petitioner,

v.

WARDEN OF CALIFORNIA STATE
PRISON–SOLANO [1], et al.,
Respondents.

No. CV.S–04–0220–LKK GGH P.

United States District Court,
E.D. California.

Jan. 18, 2005.

---

**1.** Previously named as respondent was Governor Arnold Schwarzenegger. The court now substitutes in the correct respondent, the Warden of the California State Prison–Solano, where petitioner is presently incarcerated. "A petitioner for habeas corpus relief must name the state officer having custody of him or her as the respondent to the petition." *Stanley v. California Supreme Court,* 21 F.3d 359, 360 (9th Cir.1994) (citing Rule 2(a), 28 U.S.C. foll. § 2254).

Ann Catherine McClintock, Federal Defenders Office, Sacramento, CA, for Petitioner.

Mary Jo Graves, California Dept. of Justice, Attorney General's Office, Pamela Hooley, Attorney General's Office, Sacramento, CA, for Respondents.

## ORDER

KARLTON, Senior District Judge.

Petitioner, a state prisoner proceeding with counsel, has filed this application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

On September 1, 2004, the magistrate judge filed findings and recommendations herein which were served on all parties and which contained notice to all parties that any objections to the findings and recommendations were to be filed within twenty days. Both parties have filed objection to the findings and recommendations. Petitioner has filed a reply to respondent's objections.

In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72–304, this court has conducted a *de novo* review of this case. Having carefully reviewed the entire file, the court finds the findings and recommendations to be supported by the record and by proper analysis.

Accordingly, IT IS HEREBY ORDERED that:

1. The findings and recommendations filed September 1, 2004, are adopted in full.

2. The petition is granted as to the claim that there was not sufficient evidence to support the 2001 decision finding petitioner unsuitable for parole; the petition is denied in all other respects.

3. Within thirty days of the date of this order, assuming the commission of no serious disciplinary infractions henceforth, especially infractions of a violent nature, BPT is ordered to calculate petitioner's release date, and petitioner is to be released on parole.

## ORDER AND FINDINGS AND RECOMMENDATIONS

HOLLOWS, United States Magistrate Judge.

### I. *Introduction*

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 1985, petitioner was convicted of second degree murder and sentenced to seventeen years to life with a two year enhancement for use of a firearm. Petitioner challenges the 2001 decision of the Board of Prison Terms (BPT) finding him unsuitable for parole. This was petitioner's fifth parole suitability hearing.

The petition raises the following claims: 1) Cal.Penal Code § 3041 required the BPT to set a parole date for petitioner; 2) petitioner's prison term was not propor-

tionate to persons committed for similar crimes in violation of the Equal Protection Clause; 3) petitioner was found unsuitable pursuant to a no-parole policy; 4) the Superior Court abused its discretion; and 5) there was not sufficient evidence to find petitioner unsuitable.

On May 3, 2004, respondents filed an answer to the petition, attached to which are various exhibits. On May 12, 2004, respondents filed an amended answer. The amended answer refers to the exhibits attached to the original answer.

After carefully considering the record, the court recommends that the petition be granted on grounds that there was not sufficient evidence to support the 2001 decision. The court recommends that the petition be denied in all other respects.

### II. *Anti–Terrorism and Effective Death Penalty Act (AEDPA)*

The AEDPA applies to this petition for habeas corpus which was filed after the AEDPA became effective. *Neelley v. Nagle,* 138 F.3d 917 (11th Cir.), citing *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. *Moore v. Calderon,* 108 F.3d 261, 263 (9th Cir.1997).

In *Williams (Terry) v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable appli-

cation of" that law. *Id.*, 120 S.Ct. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. *Williams (Terry)*, 529 U.S. at 407–08, 120 S.Ct. at 1520–1521, 146 L.Ed.2d 389 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law .... [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams (Terry)*, 529 U.S. at 410–11, 120 S.Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. *Woodford v. Visciotti*, 537 U.S. 19, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. *Early v. Packer*, 537 U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. *Id.* An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. *Early v. Packer*, 123 S.Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848 (9th Cir.2003).

In this case, petitioner received a silent denial from the California Supreme Court. Exhibit 2L of the answer reveals a short order by the Marin County Superior Court y concluding that the BPT's 2001 decision was supported by substantial evidence. Answer, Exhibit 2L.

III. *Background*

The background of petitioner's offense is contained in the life prisoner evaluation report prepared for petitioner's 2001 suitability hearing:

> The defendant and victim both rented separate rooms from a couple who owned a house in the San Francisco area. The couple, also, lived at the residence. The couple suspected the victim of stealing various items from them and conveyed this to Irons. On the night of March 9, 1984, Irons confronted the vic-

tim at the residence concerning the thefts and an argument ensued. The victim denied responsibility for the thefts and went to his room. Irons went to his room, obtained a .22 caliber rifle, inserted an ammunition clip and went downstairs to the victim's room. Irons called the victim's name and immediately fired 12 rounds of .22–caliber ammunition into him. Irons entered the room and told the victim he was going to let him bleed to death. When the victim complained of the pain, Irons took out his buck knife and stabbed him twice in the back. The victim was then rolled up into a sleeping bag and locked into the room. Over the next 10 days, Irons attempted to borrow a car. On March 19, 1984, Irons was able to borrow a friend's car. Irons wrapped a plastic drop cloth over the sleeping bag containing the body and then wrapped it in wire mesh weighted with pieces of pipe. After placing the body in the car, Irons drove to an isolated coastal location, carried the body into the surf as far as he could and released it.

On March 20, 1984, the body of the victim was found on the San Mateo County Coast. On March 30, 1984, the owner of the residence, where Irons and the victim were residents, was going to be arrested as a result of an investigation by the San Mateo County Sheriff's Department. At that point, Irons came forward and informed the detectives that he was the person they were looking for. Irons was subsequently arrested, advised of his rights and made a statement.

Answer, Exhibit D.

## IV. *Discussion*

### A. *Sufficient Evidence*

 Petitioner argues that there was not sufficient evidence to find him unsuitable for parole. California's parole scheme gives rise to a cognizable liberty interest in release on parole. *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir.2003). "In the parole context, the requirements of due process are met if 'some evidence' supports the decision." *Id.* The evidence underlying the board's decision must have some indicia of reliability. *Id.*

In *Biggs*, the Ninth Circuit indicated that a continued reliance on an unchanging factor such as the circumstances of the offense could result in a due process violation. Biggs was serving a sentence of twenty-five years to life following a 1985 first degree murder conviction. In the case before the Ninth Circuit, Biggs challenged the 1999 decision by the BPT finding him unsuitable for parole despite his record as a model prisoner. 334 F.3d at 913. While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs unsuitable, it upheld three: 1) petitioner's commitment offense involved the murder of a witness; 2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; 3) petitioner could benefit from therapy. 334 F.3d at 913.

The Ninth Circuit cautioned the BPT regarding its continued reliance on the gravity of the offense and petitioner's conduct prior to the offense:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest.

334 F.3d at 916.

The Ninth Circuit stated that "[a] continued reliance in the future on an un-

changing factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." 334 F.3d at 917.

The court now considers whether there was some evidence to support the finding of the 2001 panel that petitioner was not eligible for parole. The relevant regulations provide as follows.

Cal.Code Regs. tit. 15 § 2402 sets forth the criteria for determining whether an inmate is suitable for release on parole. Circumstances tending to show unsuitability include, in relevant part,

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

\* \* \* \* \* \*

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style manner.

\* \* \* \* \* \*

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

\* \* \* \* \* \*

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

Cal.Code Regs. tit. 15 § 2402(c).

Circumstances tending to indicate suitability for parole include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to the victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for the Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome ...

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

Cal.Code Regs. tit. 15 § 2402(d).

In finding petitioner unsuitable for parole, the panel found as follows:

Mr. Irons, this Panel has reviewed all information received from the public and relied on the following circumstances in concluding that you are not suitable for parole. And that you would pose an unreasonable risk of danger to society if released from prison at this time. In a unanimous decision, the Panel has-has given you a one year denial. Many factors were considered in coming to the decision. First and foremost was the commitment offense itself. This offense was carried out in an especially cruel

and callous manner. The offense was carried out in a-in a calculated manner and also in a manner which demonstrates a callous disregard for human life. And the motive for this crime was trivial in relation to the offense. These conclusions are drawn from the Statement of Facts, wherein-wherein the prisoner reacted in a-in a violent manner when informed by his landlord that a co-tenant and acquaintance of the prisoner was stealing from the landlord. This report angered the inmate and caused him to confront the victim in the victim's room. Words were exchanged, causing the inmate to-causing the inmate more anger. The inmate left the room, retrieved a rifle, returned to the victim's room and shot the victim 12 times. In addition, he also stabbed the-the victim twice with his buck knife. The inmate then wrapped the body in a sleeping bag, left the body in the victim's room and-for about 10 days before disposing of the dead body in the ocean. When he disposed the body, he prepared the body for disposal by wrapping the body with a plastic drop cloth and wire mesh weighted down with pieces of pipe. During this hearing, the inmate said he planned to get away with the murder and probably would have, if not for the imminent arrest of a-an innocent party, which caused the inmate to-to confess to the authorities regarding his responsibility for this-for this crime. The inmate's actions resulted in the demise of a human being. The-the inmate has no-has minimal prior criminality and I note there are no convictions. He did have an unstable social history and I'm referring to his drug use at the time of the-of the commitment offense. He's done well while incarcerated. His psychiatric reports are good. His parole plans are good. There is no opposition from the District Attorney towards parole in this matter. And this Panel makes the following findings: That the prisoner needs therapy and continued participation in self-help programming in order to face, discuss, understand and cope with stress in a nondestructive manner. The prisoner's gains are appreciated by this Panel and he must continue the path that he's on. And he should be commended for a large number of things. He has participated in a number-to his credit, in a number of self-help programming, and I'll name just a few. The-The Alternatives to Violence, I think there are three different phases of it, the KAIROS Program, and also, he was -he was an active participant in the Gavel Club, a Toastmaster organization, and took part in Breaking Barriers, took part in the walkathon. He obtained his GED, I believe, while incarcerated. And he hasn't had any 115s-he's had one 115 during his incarceration and that was back in-on November 2nd, 1985, and has had no 128s. However, the positive aspects of his behavior do not outweigh the factors of his unsuitability. This Panel recommends that the prisoner remain disciplinary free and that, if available, continue his participation in self-help and therapy programming. And one of the-well, there's a number of things we consider, as I said earlier, Mr.-Mr. Irons, one of the things that caused me concern was some of your responses to the questions, even when your counsel asked you. I think you were asked by your counsel whether a-a situation like this would happen again, whether you would kill somebody. And I think you said, I don't think so. I'm not-that's not a very convincing reply, to me, personally, and I-I think you're a sincere person and I certainly appreciate your-your forthrightness and your candor in this-in this hearing but as I indicated, I don't think you're quite ready for parole. I think it-

it would be some time in the near future. I think you've heard me say that before, and hopefully the outcome of this hearing won't cause you any bitterness. I know you're disappointed. And you will continue to do what you're doing.

Respondent's Answer, Exhibit B.

In finding petitioner unsuitable for parole the panel relied on the circumstances of the commitment offense. In particular the BPT stated that the offense was carried out in a calculated manner, demonstrated a callous disregard for human life, and that petitioner's motive for the crime was trivial. The panel also stated that at the time of the offense, petitioner had been using drugs.

All other factors weighed in favor of finding petitioner suitable for parole. Petitioner had no juvenile record. Respondent's Answer, Exhibit D. *See* Cal.Code Regs. tit. 15, § 2402(d)(1) (no juvenile record tends to show suitability). In addition, petitioner had a stable social history. *See* Cal.Code Regs. tit. 15, § 2402(d)(2) (stable social history tends to show suitability). The panel noted that petitioner came from a relatively stable home, although his father died when he was twelve. Respondent's Answer, Exhibit C, p. 20. Although petitioner was twice divorced with a twenty-five year old son with whom he was in contact, *Id.*, pp. 27–38, this court would not characterize these circumstances as being the type of unstable social history on which to find a prisoner unsuitable for parole.

At the hearing, petitioner discussed his remorse. *See* Cal.Code Regs. tit. 15, § 2402(d)(3) (presence of remorse indicated by understanding nature and magnitude of offense tends to show suitability). Petitioner told the panel that he wished he could go back and change what happened. *Id.*, p. 17. He stated that he had been motivated by arrogance induced by his lifestyle at the time. *Id.* He was not work-

ing steadily and had lost his spiritual values. *Id.*, p. 18.

Petitioner's criminal history was minimal. *See* Cal.Code Regs. tit. 15, § 2402(d)(6) (lack of any significant history of violent crime tends to show suitability). In 1971, petitioner was arrested for refusing to submit to induction. Respondent's Answer, Exhibit D. He was not convicted of this offense. *Id.* In 1983, petitioner was arrested for possession of cocaine and possession of a hypodermic needle. *Id.* These charges were dismissed for lack of evidence. *Id.*

Petitioner had realistic plans for the future. *See* Cal.Code Regs. tit. 15, § 2402(d) (realistic plans or development of marketable skills tends to show suitability). Petitioner told the panel that upon release he planned to use the services of Samaritan House in San Mateo, which appears to be a half-way house. Respondent's Answer, Exhibit C, p. 28. Petitioner could also live with his mother in El Dorado County. *Id.* Petitioner also had a letter from Illuminata Films in Sausalito. *Id.*, p. 32–33. The letter, written by Executive Producer Ann Rogers, stated that she met petitioner in 1999 when she volunteered with the Alternatives to Violence Project at San Quentin. *Id.*, p. 33. She agreed to pay petitioner $15.00 an hour for 30 hours a week to provide computer and office assistance to Illuminata. *Id.* She wrote, "Carl's computer skills and gifted writing ability will be a tremendous asset to our operation. In addition, Carl is welcome to occupy the extra bedroom in my Mill Valley home, if that suits his parole specifications." *Id.*, pp. 33–34.

The psychological report prepared by Dr. Flax in 1999, which the 2001 panel considered, indicated that petitioner was suitable for parole. *See* Respondent's Answer, Exhibit C, p. 25 (discussion of Flax report by panel). *See* Cal.Code Regs. tit.

15, § 2402(c)(5) (lengthy history of severe mental problems related to offense tends to show *un*suitability). A copy of this report is attached to the answer as Exhibit E. Dr. Flax concluded,

It appears to this writer that Mr. Irons possesses the skills, maturity, and social support necessary to be successful if released to the community. He has grown up in many ways throughout his years in prison and has developed plans for his future life as a law-abiding citizen in the community.

The panel also referred to the Life Prisoner Evaluation Report prepared by prison Counselor Sorgdrager for petitioner's 2001 suitability hearing. *Id.*, p. 23 (discussing report). This report supported a finding that petitioner was suitable for parole based on his conduct in prison. *See* Cal.Code Regs. tit. 15, § 2402(c)(6) (serious misconduct in jail tends to show *un* suitability). A copy of this report is attached to respondent's answer as Exhibit D. In this report Counselor Sorgdrager described petitioner's custody history:

Irons was originally received in CDC on 05/08/85. He was processed through the Northern Reception Center at the California Medical Facility and then transferred to the Correctional Training Facility for Level IV programming. He was subsequently transferred to California Medical Facility–South for Level III programming and was transferred to San Quentin (SQ)-II for Level II programming on 03/26/93. His initial review established his custody at Close B due to the length of his term. Iron's custody was reduced to Medium A on 06/06/88 due to his positive programming and he has maintained Medium A custody since that time. Irons has held clerical positions in the following areas: Assignment Lieutenant's office, Computer Room, Procurement, Education, Prison Industry Authority (PIA), Data Processing, Vocational Machine and is currently assigned to Vocational Printing. Irons has also completed a course in Electronic Data Processing. Work Supervisor Reports throughout his incarceration indicate above average to exceptional job performance.

Respondent's Answer, Exhibit D.

In his report Counselor Sorgdrager also noted that the probation officer's report indicated that petitioner tended to see people as either friends or enemies, and that he clearly viewed the couple who owned the house as friends. *Id.* Counseler Sorgdrager states, "This is probably the most significant factor that led to his commission of this crime." *Id.* The panel asked petitioner if he agreed with this observation. Respondent's Answer, Exhibit C, p. 21. Petitioner responded that there was some truth to it. *Id.* He told the panel that he tends to be very loyal to his friends. *Id.* He also stated, "To at least some extent, I've learned that I don't have to get along with everybody in the world and that doesn't mean that they're my enemy. We just can go our separate ways." *Id.* The court does not find that the counselor's observation and petitioner's response in any way undercut Dr. Flax's conclusion that petitioner was suitable for release.

Counselor Sorgdrager's report also described petitioner's therapy and self help activities:

Irons has participated in the following programs: Alcoholics Anonymous 05/90, 05/91; Men's Violence Prevention Seminar (ten weekly sessions) 07/92; Breaking Barriers 08/92; Victim/Offender Reconciliation Group 12/92; Gavel Club, 12/94–02/99; Walk–A–Thon '96, 05/96; Alternatives to Violence, 08/96; Advance Alternative to Violence, 12/96; and Alternatives to Violence Training for Co-facilitators Workshop, 07/97. Basic Alternatives to Violence Inside

Co-facilitator 7/98, 10/98, 5/99, 4/00, 6/00, Spirituality Class 4/99, 10/99 Irons has certificates in completion in the following areas: Electric Data Processing 6/21/90; Principle Copy Planning 6/30/97; Cold Type Composition (Photo Typesetting) 9/30/97 Proofreading and Correction 12/31/97.

Respondent's Answer, Exhibit D.

In his report, Counselor Sorgdrager stated that petitioner had received one serious CDC disciplinary report on November 2, 1985, for delaying close custody counts. *Id.* No other disciplinary report were noted. *Id.*

In his summary, Counselor Sorgdrager concluded that petitioner would pose a low degree of threat to society if paroled:

Irons behavior while incarcerated has been conforming and his programming has been exceptional. He maintains an excellent rapport with both staff and inmates and constantly strives toward personal growth.

The callousness of Irons crime cannot be overlooked. However, the major changes in his violence potential, as documented in his psychiatric reports, cannot be diminished nor denied.

In his first psychiatric report dated 01/24/89, Dr. Martin documents, "If he is to be released, I feel that his potential for violence is greater than that of the average inmate because of his not coming to terms with his crime and its meaning for him." Whereas, in Irons most recent psychiatric report dated 07/15/99, Dr. Flax states, "It appears to this writer that Mr. Irons possess the skills, maturity, and social support necessary to be successful if released to the community. He has grown in many ways throughout his years in prison ...." Under the category labeled, *If Released to the Community:* Dr. Flax writes, Mr. Irons gives no indication of being dangerous if released to the community. It also cannot be ignored that the investigating Detective Sergeant, on Irons case, stated in court that he did not feel that Irons would be a threat in the future. This was stated on May 1, 1985, fifteen (15) years ago. After spending 15 years being involved in self-help groups, alternatives to violence groups, and other non-violence oriented groups, I feel that statement is truer now then it was at the time the Detective Sergeant uttered it.

Taking into account the commitment offense, the minimal criminal history adjustment to prison, programming efforts, and the psychological report dated 07/15/99, by Dr. Flax, I believe that Irons will pose a low degree of threat to society if paroled.

Respondent's Answer, Exhibit D.

The Deputy District Attorney attending petitioner's 2001 suitability hearing stated that his office would submit the issue to the discretion of the panel. Respondent's Answer, Exhibit C, p. 49. In other words, the District Attorney's Office did not oppose a finding of suitability.

In finding petitioner unsuitable, the panel stated that it was troubled by petitioner's response to questions from his counsel asked during the hearing regarding whether he would kill somebody again. The panel stated that petitioner's answer of "I don't think so" was not very convincing. The court will set forth below the exchange the panel is referring to:

Attorney: You gave the impression, in response to one of the questions, almost that if it wasn't [the victim], that it might have been somebody else. Was that the impression that-that you made, or intended to give?

Petitioner: Looking back on it, after the fact, I-now, I guess that those two questions relate to each other. Looking back, I realize that I was responsible.

And in that sense, it could have been somebody else. I mean, I don't mean I was going to kill somebody at random, but the circumstances-some set of circumstances that led me to that rage, I was primed for it. I was-I had let myself become that person who could kill and it could have been somebody else. I'm fortunate that it wasn't.

Attorney: Do you have any of that rage now?

Petitioner: *I don't think so.* I try to make a real effort to examine my motives, to look inside of myself . . .

Respondent's Answer, Exhibit C, pp. 45–46.

The court does not agree with the panel's finding that petitioner's comments suggested that he was not sure if he was capable of killing again. In fact, earlier in the hearing when directly asked if he could kill again petitioner answered unequivocally "no."

Presiding Commissioner Munoz: It's-well, you were overcome with anger, no doubt, and you killed a man. Would you do that today?

Petitioner: No.

*Id.*, p. 17.

In finding petitioner unsuitable at this fifth parole suitability hearing, the panel relied exclusively on unchanging factors: the commitment offense and petitioner's drug use at the time of the offense. In *Biggs*, the Ninth Circuit stated that the BPT was *"initially* justified" in finding Mr. Biggs unsuitable based on the circumstances of the offense and his conduct prior to imprisonment. 334 F.3d at 916 (emphasis added). However, the Ninth Circuit was not specific as to when reliance on the circumstances of the offense and conduct prior to imprisonment would "run contrary to the rehabilitative goals espoused by the prison system" and result in a due process violation. 334 F.3d at 917.

More important to the undersigned in assessing any due process violation is the fact that continuous reliance on unchanging circumstances transforms an offense for which California law provides eligibility for parole into a de facto life imprisonment without the possibility of parole. The court asks rhetorically—what is it about the circumstances of petitioner's crime or motivation which are going to change? The answer is nothing. The circumstances of the crimes will always be what they were, and petitioner's motive for committing them will always be trivial. Petitioner has no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious or the motive was more than trivial. Given that *no one* seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point of non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility.[2]

In the instant case, the BPT has apparently relied on these unchanging factors at least four prior times in finding petitioner unsuitable for parole. Petitioner has "continue[d] to 'demonstrate exemplary behavior and evidence of rehabilitation.'" 334 F.3d at 916. Under these circumstances, the continued reliance on these factors at the 2001 hearing violated due process.

2. To a point, it is true, the circumstances of the crime and motivation for it may indicate a petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, after fifteen or so years in the caldron of prison life, not exactly an ideal therapeutic environment to say the least, and after repeated demonstrations that despite the recognized hardships of prison, this petitioner does not possess those attributes, the predictive ability of the circumstances of the crime is near zero.

■ Finally, the one other reason given by the BPT for parole denial—the need for more therapy such that petitioner can face, discuss, understand and cope with stress in a nondestructive manner—is devoid of *any* medical or other evidence in support. The conclusion appears to be simply one repeated often in order to add another factor to the non-suitability conclusion. Clearly, a conclusion by lay BPT commissioners that petitioner has not yet achieved required therapy for insight or other reasons is not reasonably sustainable, and a state court's conclusion to the contrary is patently unreasonable.

■ Respondent argues that the instant petition should be denied as moot because petitioner has had two subsequent parole suitability hearings. Under Article III, § 2 of the Constitution, an action is moot if it no longer presents a case or controversy. "Once a convict's sentence has expired, however, some concrete and continuing injury other than the now-ended incarceration or parole—some 'collateral consequence' of the conviction—must exist if the suit is to be maintained." *Spencer v. Kemna,* 523 U.S. 1, 7, 118 S.Ct. 978, 983, 140 L.Ed.2d 43 (1998).

Petitioner is still in custody as a result of the 2001 suitability hearing. That he has had two suitability hearings since that time does not render his challenge to the 2001 hearing moot. *See Hubbart v. Knapp,* 379 F.3d 773 (9th Cir.2004) (expiration of SVP commitment term did not moot petitioner's case regarding the expired commitment proceedings even though new proceedings had been commenced). Moreover, petitioner was found unsuitable after the 2002 hearing on the same grounds as the 2001 decision was based. *See* Transcript from March 20, 2002, hearing, respondent's answer, Exhibit S. However, the panel conducting the 2002 hearing additionally found that petitioner required additional AA and NA programming. *Id.,* decision of panel, p. 7. No evidence submitted at the hearing supported this recommendation. In fact, Dr. Flax's report, on which the 2002 panel relied, stated that petitioner had no known substance abuse treatment needs. Respondent's Answer, Exhibit E.

At the 2002 hearing, the Deputy District Attorney who actually prosecuted petitioner appeared and spoke in favor of petitioner's release on parole. Deputy District Attorney Wagstaffe stated, in part,

> And that is, I say at many other parole hearings. I don't want to say somebody is okay to be paroled until I can tell you I would feel comfortable with that person living on my street, as my next door neighbor. And I do hold that standard. And that's a standard I hold today. And if life would have it that Carl Irons was my next door neighbor or I heard that he was going to move next door to me, my view to you would be I'm going to have a good neighbor; not that-Don't let that happen. And realizing that within myself, that's why I (indiscernible) this is on behalf of our office and our county, that we do not pose any objection to you-if you choose, based on all the factors you have to look at.

*Id.,* pp. 70–71.

The 2003 panel found petitioner unsuitable for parole on the same grounds as the 2001 decision was based. Respondent's Answer, Exhibit 6. However, the panel also found petitioner unsuitable because he had received a prison disciplinary since his last hearing. *Id.,* decision, p. 2. In particular, petitioner was found guilty of over familiarity with prison staff. *Id.,* p. 34. At the hearing, petitioner discussed the disciplinary with the panel. Petitioner's female supervisor filed the charge against him after petitioner engaged in conduct which apparently made her uncomfortable. *Id.,* p. 38. Petitioner stated that before he

began working for her, he realized that there could be a problem because she was younger and more attractive than most of the women he had worked around. *Id.*, p. 38. Because he did not trust his socialization skills having been in prison for so long, he asked her to tell him if he did anything inappropriate. *Id.* About one month later, she told him that he was doing something to make her uncomfortable. *Id.* Petitioner told her that if it happened in the future, she should tell him again. *Id.* The next thing that happened was the "incident" that resulted in the rules violation report. *Id.*

It is unclear to the court what the "incident" involved. The panel referred to a letter stating that petitioner had rubbed his supervisor's back, but it is not clear if this was the incident that led to the rules violation report. *Id.*, p. 39.

The court's finding that the 2001 decision finding him unsuitable was not supported by some evidence is somewhat complicated by the prison disciplinary petitioner received approximately two years later. However, the court notes that the psychological report prepared for the 2003 hearing acknowledged the rules violation report but still concluded that petitioner would be a low risk of dangerousness upon release. *Id.*, pp. 40–41. Because the nature of this disciplinary was not serious and did not reflect on petitioner's ability to function upon release, the court does not find that it effects the conclusions regarding the 2001 hearing.

Accordingly, for the reasons discussed above, the court finds that the California Supreme Court's silent denial of this claim was an unreasonable application of clearly established Supreme Court authority. The petition should be granted as to this claim.

## B. *Remaining Claims*

■■■ Petitioner argues that Cal.Penal Code § 3041 requires the BPT to give him a parole date. Section 3041 provides that one year prior to the inmate's minimum eligible parole release date a panel consisting of at least two commissioners of the BPT shall meet with the inmate and *shall normally* set a parole release date. Petitioner appears to argue that because § 3041 provides that the BPT shall normally set parole release dates, the BPT violated due process by failing to set his parole release date.

As discussed above, California's parole scheme gives rise to a cognizable liberty interest in release on parole. *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir.2003). "In the parole context, the requirements of due process are met if 'some evidence' supports the decision." *Id.* If there is not some evidence to support a decision denying parole, due process is violated. Therefore, even though California law states that the BPT shall normally set parole release dates, due process does not require the BPT to state a date where some evidence exists demonstrating that petitioner should not be paroled. Accordingly, petitioner's claim that the BPT was required to set his parole release date pursuant to Cal.Penal Code § 3041 is without merit.

■■■ Petitioner next argues that by finding him unsuitable, the BPT is making him serve a sentence that is longer than that prescribed for similar crimes of second degree murder. In support of this claim, petitioner refers to Cal.Code Regs. tit. 15, § 2403 which sets forth a matrix of base terms for second degree murder. The court construes this claim as alleging a violation of the Equal Protection Clause.

■■■ "The Constitution permits qualitative differences in meting out punishments and there is no requirement that

two persons convicted of the same offense receive identical sentences." *Williams v. Illinois,* 399 U.S. 235, 243, 90 S.Ct. 2018, 2023, 26 L.Ed.2d 586 (1970). Parole considerations require only a rational relationship to legitimate state interests. *McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059–60, 35 L.Ed.2d 282 (1973).

In order to prevail on this claim, petitioner must demonstrate that similarly situated prisoners have been released on parole sooner than him. *See McQueary v. Blodgett,* 924 F.2d 829, 835 (9th Cir.1991). In other words, petitioner must demonstrate that prisoners convicted of second degree murder based on similar circumstances have been released on parole. Petitioner has not done this. Accordingly, this claim is without merit.

 Petitioner next argues that the BPT and former Governor Davis in conspiracy have pre-determined that no murder-lifer will be paroled. Petitioner argues that he was denied parole pursuant to this illegal policy. These allegations state a claim for violation of the due process clause. *See McQuillion v. Schwarzenegger,* 369 F.3d 1091, 1097 (9th Cir.2004).

In support of this claim, petitioner submitted various exhibits. Exhibit I attached to the exhibit package filed in support of the petition is a declaration by Albert Leddy. Mr. Leddy served from 1983 to 1992 as Commissioner and then Chairman of the BPT. In his declaration, dated March 15, 1999, Mr. Leddy contends that former Governor Wilson had a no-parole policy. This declaration does not support petitioner's claim that he was denied parole in 2001 pursuant to former Governor Davis's no-parole policy.

Exhibit K submitted in support of the petition is a copy of an article from the San Francisco Examiner. This undated article quotes former Governor Davis as stating that he would be "hard-pressed to find any reason" to parole a convicted murderer. Exhibit L is a copy of an article from the Los Angeles Times which quotes former Governor Davis as stating that he believes that murderers should serve at least a life sentence. This evidence does not demonstrate a conspiracy between the BPT and former Governor Davis to deny parole to inmates convicted of murder and serving life sentences.

In *In re Rosenkrantz,* 29 Cal.4th 616, 128 Cal.Rptr.2d 104, 59 P.3d 174 (2002), the California Supreme Court considered the trial court's finding that the Governor, in revoking the Board's grant of parole, had applied a no-parole policy. This finding was based on express quotes of the Governor expressing that all convicted murderers should serve life terms without exception, as well as the Governor's review and reversal of almost all grants of parole. 29 Cal.4th at pp. 684–685, 128 Cal.Rptr.2d at 162–163, 59 P.3d 174. The California Supreme Court found this to be insufficient evidence of a no-parole policy. It reasoned that even if the quotations truly did reflect the Governor's views when he made the statements, his subsequent actions of either affirming the grant of parole or providing individualized analyses for reversing the Board's findings of suitability belied the claim that he was applying a blanket policy of reversing the grant of parole regardless of the circumstances of the particular case. 29 Cal.4th at 685, 128 Cal.Rptr.2d at 163, 59 P.3d 174.

In *Rosenkrantz,* the California Supreme Court also observed that the BPT had approved a much larger number of paroles than the former Governor. 29 Cal.4th at p. 638, n. 5, 128 Cal.Rptr.2d at 124, 59 P.3d 174. This finding undercuts petitioner's claim that the BPT and former Governor Davis conspired to deny parole to convicted murderers serving life sentences. For these reasons, this claim has no merit.

Because the denial of these claims by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority, these claims should be denied.

Finally, petitioner argues that the Marin County Superior Court erred in twice denying his applications for petitions for writs of habeas corpus. Petitioner contends that the Superior Court should have found that the BPT improperly found him unsuitable. This claim is really further argument in support of the claim raised in the instant petition that there was insufficient evidence to support the unsuitability finding.[3] Accordingly, the court will not address this claim further.

*Conclusion*

Because the petition should be granted, appointment of counsel is warranted to represent petitioner in the proceedings which will follow this recommendation.

Accordingly, IT IS HEREBY ORDERED that:

1. The Office of the Federal Defender is appointed to represent petitioner;

2. The Clerk of the Court is directed to serve a copy of these findings and recommendations on Assistant Federal Defender Ann McClintock;

IT IS HEREBY RECOMMENDED that the petition be granted as to the claim that there was *not* sufficient evidence to support the 2001 decision finding petitioner unsuitable for parole; the petition should be denied in all other respects.

Assuming the commission of no serious disciplinary infractions henceforth, especially infractions of a violent nature, BPI should be ordered to calculate petitioner's release date, and if such would have already occurred, petitioner should be released on parole.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst,* 951 F.2d 1153 (9th Cir.1991).

Dated: Sept. 1, 2004.

---

**3.** Respondent construes this claim as alleging that the Superior Court Judge was not impartial. The court does not construe this claim to be alleging impartiality by the Superior Court Judge.