Robert M. ROSENKRANTZ, Petitioner,

v.

John MARSHALL, Warden
Respondents.

No. CV 05–3836 GAF (AJW).

United States District Court,
C.D. California,
Western Division.

Aug. 1, 2006.

Marc E. Grossman, Law Offices of Marc E. Grossman, Upland, for Petitioner's counsel.

Amanda Lloyd, Office of the Attorney General, San Diego, Respondent's counsel.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

FEESS, District Judge.

The Court has reviewed the entire record in this action, the Report and Recommendation of Magistrate Judge ("Report"), and petitioner's objections. The Court concurs with and adopts the findings of fact, conclusions of law, and recommendations contained in the Report after having made a *de novo* determination of the portions to which objections were directed.

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

### Background

WISTRICH, United States Magistrate Judge.

When petitioner was 18 years old, his younger brother, Joey, and his brother's friend, Steven Redman, secretly spied on him in order to confirm their suspicion that petitioner was a homosexual. Joey and Redman watched petitioner with a male companion through a window of petitioner's parents' beach house. Redman decided that they should enter the house in order to take pictures of petitioner and his companion so he could prove to others that petitioner was gay. Before doing so, Redman and Joey obtained a flashlight and a stun gun from Joey's car. Redman then kicked in the door of the house, yelled "Get the fuck out of here you faggots," and struck petitioner with the flashlight, breaking his nose. Joey burned petitioner's hands with the stun gun. Petitioner obtained a BB gun from his car and attempted to prevent Redman and Joey from leaving. Petitioner's father was called to the house, and Redman told him that he and Joey had seen petitioner with another male who had his pants down.

The next morning, petitioner insisted to his father that he was heterosexual, and that Redman and Joey had lied. Petitioner's father was extremely upset and angry. Petitioner was kicked out of his parents' home. He spent that night in his car. During the next few days while he was living alone in his car, petitioner obtained a firearm.[1] Petitioner then confronted Redman with the firearm, demanding that he recant what he had told petitioner's father. Redman refused and continued to taunt and ridicule petitioner. Petitioner shot Redman ten times, killing him.

Petitioner was acquitted by a jury of first degree murder. He was convicted of second degree murder, and sentenced to fifteen years to life, plus a two year term for using a firearm.

In the two decades since his crime, petitioner has had a perfect prison record. He has never committed a violent act, or engaged in any other conduct warranting discipline. While in prison, he has earned an A.A. degree from Chapman College, and a B.S. degree in computer science from Columbia Southern University. He has completed every therapy and self-help program available, and has obtained numerous vocational certifications. Petitioner has received exceptional work reports,

---

1. The firearm was an Uzi.

including special recognition for developing software programs for staff training, tracking sexually violent predators, and managing the inmate welfare fund. He has earned glowing recommendations from prison psychiatrists and correctional counselors, all of whom have opined that petitioner presents no more risk of danger than the average person in the community. Petitioner has realistic parole plans, including family and community support, employment, and a residence. He has letters urging that he be granted parole from the trial judge, family members, legislators, the arresting officer, and the victim's only living relative. Further, although they subsequently changed their minds, both the District Attorney and the Sheriff's Department have previously not opposed granting petitioner parole. He even saved another inmate's life.

Not surprisingly, after petitioner's second parole unsuitability hearing in 1996, the Board of Prison Terms ("BPT")[2] concluded that petitioner did not pose an unreasonable risk of danger to society or a threat to public safety, and that he was suitable for parole. [*See* Petitioner's Ex. B]. As the BPT explained, petitioner had no criminal record; a stable social history; no drug or alcohol involvement; excelled in school; participated in prison programs; upgraded educationally; participated extensively in self-help and therapy so as to "come to an understanding of why he reacted so violently" in committing his offense; received excellent work reports; possessed realistic parole plans; maintained positive institutional behavior indicating "significant improvement in self-control;" and demonstrated acceptance of responsibility and remorse. [Petitioner's Ex. B at 2–3]. The panel also found that petitioner committed the crime as a result

of significant stress in his life, namely, being exposed as a homosexual to his father, who then rejected petitioner because of the revelation. In addition, the panel noted that psychological reports from 1989, 1994, and 1996 all supported release. Further, the panel pointed out that the trial judge supported granting parole, opining that petitioner's offense was "situational," and that petitioner was "highly unlikely to re-offend." [Petitioner's Ex. B at 4]. Finally, the panel noted that the governor's legal advisor and the district attorney supported petitioner's release. [Petitioner's Ex. B at 4]. Consequently, petitioner received a March 30, 2000 parole date. [Petitioner's Ex. B at 1].

The 1996 decision, however, was disapproved by the BPT's decision review committee, on the ground that the panel had not considered some of the facts of the commitment offense. *See In re Rosenkrantz*, 80 Cal.App.4th 409, 414 n. 3, 95 Cal.Rptr.2d 279 (2000).

After parole hearings in 1996, 1997 and 1998, BPT panels found petitioner unsuitable for parole. The December 1996 decision was the rehearing on the panel's grant of parole earlier in 1996. One of the panel members at the rehearing had served on the decision review committee that had reversed the original panel's grant of parole. This rehearing panel considered, among other things, a letter from the investigating homicide detective, which addressed some of the points in the decision review unit's decision and reflected the detective's view that petitioner should be paroled. In particular, the detective stated that when investigating the crime, he had found a knife on Redman's body. *See In re Rosenkrantz*, 29 Cal.4th 616, 631, 128 Cal.Rptr.2d 104, 59 P.3d 174

---

**2.** The Board of Prison Terms was abolished as of July 1, 2005, and replaced by the Board of Parole Hearings. Cal.Penal Code § 5075(a).

Because the decision petitioner challenges was made in 2004, the Court refers to the parole agency as the BPT.

(2002), *cert. denied,* 538 U.S. 980, 123 S.Ct. 1808, 155 L.Ed.2d 669 (2003). Despite this additional favorable evidence, the panel ultimately denied parole based upon the finding that the commitment offense was carried out in a dispassionate and calculated manner. *See Rosenkrantz,* 80 Cal. App.4th at 416 n. 5, 95 Cal.Rptr.2d 279.

The panel at the 1997 hearing included two of the three panel members who had served on the decision review committee which reversed the 1996 grant of parole. The new evidence presented at the hearing was entirely positive, and included the District Attorney's statement that he was "not opposed to this man receiving a parole date." *Rosenkrantz,* 80 Cal.App.4th at 417, 95 Cal.Rptr.2d 279. In addition, letters written by Assemblywoman Carole Migden, Assemblywoman Martha Escutia, and Senator John Vasconcellos wrote to urge the BPT to consider that, although Redman's violence "obviously does not absolve [Rosenkrantz] of responsibility" for Redman's death, it was a factor to be considered, and opined that "[t]he action of the Board in overturning the June 1996 decision to release Mr. Rosenkrantz raises the disturbing possibility that the reprehensible gay-bashing endured by Mr. Rosenkrantz is not being viewed in the same light as other hate crimes, despite the fact that the law of California recognizes it as an equally grave offense." *Rosenkrantz,* 80 Cal.App.4th at 418 n. 8, 95 Cal.Rptr.2d 279. Nevertheless, the panel denied parole,

finding that (a) the offense was carried out in a cruel and callous manner with a disregard for the life and suffering of another, in a dispassionate and calculated manner, and (b) petitioner had not sufficiently participated in beneficial self-help and therapy programming. *See Rosenkrantz,* 80 Cal. App.4th at 418, 95 Cal.Rptr.2d 279.

In 1998, the BPT reached a split decision, with two of the three members of the panel finding petitioner unsuitable for parole. The majority explained its reasoning as follows: "The number one reason was the offense was carried out in a manner which exhibits a callous disregard for the life and the suffering of another. These conclusions are drawn from the Statement of Facts where the prisoner laid in wait for the victim to come out. ... He confronted him and, during the course of the confrontation, an argument ensured [sic] and the victim was subsequently shot ten times." *Rosenkrantz,* 80 Cal.App.4th at 418, 95 Cal.Rptr.2d 279.[3]

The California Superior Court reviewed the 1996, 1997 and 1998 decisions denying parole, and reversed them, ordering the BPT to set a parole date. The Superior Court found that the decisions to deny parole were "contrary to the evidence presented at the hearing" and that "[a]ll of the evidence ... indicated that the defendant is not a danger to society." The Superior Court rejected the BPT's reliance upon statements that the crime was "dis-

---

**3.** As the state appellate court explained, the panel later modified its decision.

> On October 27, 1998, the Decision Review Unit recommended a "modification" of the decision. According to this report, "[a]lthough the hearing panel clearly recognized that the inmate was convicted of second degree murder, in the decision portion of the hearing transcript, the panel inadvertently stated, '... laid in wait.' " The recommendation was to "excise" that lan-

> guage from the decision and replace it with a statement that he " '... waited in his vehicle all night outside the victim's condominium complex, until the victim emerged.' " The next day, the Decision Review Committee (with Commissioner Ortega serving as one of a committee of three) adopted the recommendation and modified the decision.

> *Rosenkrantz,* 80 Cal.App.4th at 419 n. 12, 95 Cal.Rptr.2d 279.

passionate," "calculated" and "carried out in a manner which exhibits a callous disregard for the life and suffering of another," concluding that no evidence supported such conclusions.[4]

4. As the Superior Court explained:
"It is difficult to imagine that any inmate could present a better picture than the defendant has in terms of his background, his institutional adjustment, and his parole plans. However this court recognizes that no matter how stellar an inmate's adjustment and progress in the institution may be, it can be outweighed by the circumstances of the offense. In evaluating the circumstances of the offense, the Board must accept the verdict of the jury. In this case, the defendant was Expressly Acquitted of First Degree Murder. The jury found the defendant not guilty of premeditation and deliberation. This was after a trial in which the defendant himself testified about the circumstances of the offense. In reading the comments of the commissioners at the last three hearings and the statements of decision, it is apparent that some commissioners decided on their own that the evidence supports a finding of premeditation and lying in wait and have based their decisions denying parole on these findings, contrary to the express findings of the jury. The primary reason for denying parole in all three hearings is that the offense was 'dispassionate' and 'calculated' and/or was 'carried out in a manner which exhibits a callous disregard for the life and suffering of another.' " 'Dispassionate' means 'free from emotion or prejudice; calm and impartial.' ... No rational person could describe this killing as calm and without emotion.... [¶] 'Calculated' means 'planned.' ... The verdict expressly rejected that the killing was planned. In finding the defendant not guilty of premeditation and deliberation, the jury must have accepted the defendant's claim that he did not go to the house planning to murder, the victim. In finding him guilty of second degree murder, they found that he did not form the intent to kill until just shortly before the killing. The finding that the killing was 'dispassionate' and 'calculated' is contrary to the evidence and contrary to the verdict of the jury.
"At the last hearing of the Board of Prison Terms, the commissioners must have finally realized that this factor, that is, that the

Pursuant to the Superior Court's direction, a new hearing was held in 1999. At the hearing, additional favorable evidence regarding petitioner's performance in prison was submitted, as well as addi-

killing was 'dispassionate and calculated' was not applicable to this case. Instead they found that the 'offense was carried out in a manner which exhibits a callous disregard for the life and suffering of another.' (Of course, all second degree murders by their nature involve a disregard for the life of another.) The regulations word this factor slightly differently: 'The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.' [§ 2402, subd. (c)(1)(D).] This appears to refer to something akin to torture or that the victim suffered much more than that which would be inherent in any killing. There is no evidence of that in this case. In support of this 'callous disregard' finding, the Board stated, 'These conclusions are drawn from the Statement of Facts where the prisoner laid in wait for the victim to come out.' ... 'Lying in wait' is a special circumstance which, if found to be true by a jury, requires a sentence of life without the possibility of parole.... Apparently recognizing that this may seem inconsistent with a verdict of second degree murder, legal counsel [for the Board] recommended that 'laid in wait for the victim to come out' be deleted and replaced with 'waited in his vehicle all night outside the victim's condominium complex, until the victim emerged.' There is nothing in this case to support a finding of an exceptionally callous disregard for the suffering of another. The superior court also found that two commissioners who had participated in several of petitioner's parole hearings were biased against petitioner and precluded them from sitting on his parole hearings.

*Rosenkrantz,* 80 Cal.App.4th at 419–420, 95 Cal.Rptr.2d 279.

The appellate court's suggestion that the BPT could not rely upon facts that the jury had not found true beyond a reasonable doubt was subsequently rejected by the California Supreme Court. *Rosenkrantz,* 29 Cal.4th 616, 679, 128 Cal.Rptr.2d 104, 59 P.3d 174 (2002).

tional letters in support of parole, including the Sheriff's Department Homicide Division statement of nonopposition to parole. *Rosenkrantz,* 80 Cal.App.4th at 421, 95 Cal.Rptr.2d 279. Nevertheless, the BPT panel again found petitioner unsuitable for parole, explaining:

> The number one reason, really the only reason, is the commitment offense itself. You've done tremendously while you've been in the institution, you've made tremendous progress. But it's the nature of the crime itself is the reason we found you unsuitable for parole. The Panel found that the offense was carried out in especially cruel or callous manner and that it was carried out in a dispassionate or calculated manner, such as an execution style murder, and that the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering...

*Rosenkrantz,* 80 Cal.App.4th at 422 n. 14, 95 Cal.Rptr.2d 279. [Petitioner's Ex. C at 1]. Although it found petitioner unsuitable for parole, the BPT panel nevertheless set a June 30, 2001 parole date in compliance with the Superior Court's decision. [Petitioner's Ex. C]. Former Governor Gray Davis reversed the grant of parole, explaining that the finding of suitability was "based solely on an order from the Los Angeles Superior Court, which order is now on appeal." *Rosenkrantz,* 80 Cal. App.4th 409 at 422, 95 Cal.Rptr.2d 279.

The California Court of Appeal subsequently affirmed the Superior Court's decision, holding that the BPT's 1999 finding of unsuitability was unsupported by any evidence. *Rosenkrantz,* 80 Cal.App.4th at 427, 95 Cal.Rptr.2d 279. In discussing the appropriate remedy, it stated that

> [a]t some point, a failure to follow the law, or the continued application of an arbitrary and irrational standard, will rise to the level of a substantive due process violation. (*Cf. Stubblefield Con-struction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 708–710 [38 Cal.Rptr.2d 413]; *Pearson v. City of Grand Blanc* (6th Cir.1992) 961 F.2d 1211, 1216–1217.)

*Rosenkrantz,* 80 Cal.App.4th at 428–429, 95 Cal.Rptr.2d 279.

On June 30, 2000, a new BPT panel found petitioner suitable for parole, explaining that he "would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The panel found that petitioner had committed his crime as the result of "significant stress" in his life, that he showed remorse and had accepted responsibility for his crime, and that his most recent psychological report demonstrated that he was "a very low risk for future violence" and "clearly not a criminally oriented individual." *In re Rosenkrantz,* 116 Cal.Rptr.2d 69, 74 (2002). The panel set petitioner's parole release date as March 30, 2001. [Petitioner's Ex. D]. Former Governor Davis also reversed that decision. *Rosenkrantz,* 116 Cal.Rptr.2d at 74.

Petitioner challenged former Governor Davis's decision in a state habeas petition. The Superior Court granted the petition after concluding that there was no evidence supporting the former Governor's decision, and that the former Governor's decision was based upon an impermissible general policy of automatically denying parole to prisoners convicted of murder. The Court of Appeal affirmed the judgment of the Superior Court. *Rosenkrantz,* 116 Cal.Rptr.2d at 83–84. The California Supreme Court, however, reversed. *Rosenkrantz,* 29 Cal.4th at 625, 128 Cal. Rptr.2d 104, 59 P.3d 174. It found that while there was no evidence supporting some of former Governor Davis's stated reasons for finding petitioner unsuitable for parole, there was some evidence supporting the former Governor's finding that

petitioner's offense was carried out in a dispassionate and calculated manner. *Rosenkrantz*, 29 Cal.4th at 678–679, 128 Cal. Rptr.2d 104, 59 P.3d 174.[5]

On January 5, 2004, a new BPT panel found petitioner unsuitable for parole based solely upon the gravity of his commitment offense. [Petitioner's Ex. A at 113–114]. Petitioner sought habeas relief in the state courts. On October 7, 2004, the Superior Court denied petitioner's habeas petition, concluding that there was "some evidence" to support the BPT's decision—namely, "the circumstances of the life crime were such that they could reasonably be considered more aggravated or violent than the minimum necessary to sustain a conviction for second-degree murder." [Petitioner's Ex. G]. On November 15, 2004, the California Court of Appeal denied petitioner's habeas petition without explanation.[6] [Petitioner's Ex. H]. On February 2, 2005, the California Supreme Court also rejected petitioner's claims without explanation. [Petitioner's Ex. I].[7]

Petitioner filed this federal habeas corpus petition alleging that the BPT's 2004 decision finding him unsuitable for parole violated due process. Because the BPT's 2004 decision fails to satisfy even the forgiving "some evidence" test for constitutionality prescribed by the Supreme Court, the petition should be granted.

5. Justice Moreno wrote separately to emphasize the narrowness of the decision.

> Although I agree that evidence of premeditation and deliberation supports the conclusion that petitioner's crime was particularly egregious for a second degree murder, it is another matter whether any evidence would support the same conclusion for a first degree murder. Other than felony murders, first degree murders by definition involve premeditation and deliberation. Moreover, there was sufficient doubt over whether premeditation and deliberation existed to persuade a jury to acquit petitioner of first degree murder. Furthermore, petitioner's offense did not appear to partake of any of those characteristics that make an offense particularly egregious under the Board of Prison Terms' parole eligibility matrix for first degree murders, e.g., torture, the infliction of severe trauma not involving immediate death, or murder for hire. (Cal.Code Regs., tit. 15, § 2403, subd. (b).) Nor is it certain that petitioner's lack of remorse immediately following the crime, by itself, would make the crime exceptional compared to other first degree murders. The significance of the above observations is this: there will come a point, which already may have arrived, when petitioner would have become eligible for parole if he had been convicted of first degree murder. Once petitioner reaches that point, it is appropriate to consider whether his offense would still be considered especially egregious for a first degree murder in order to promote the parole statute's goal of proportionality between the length of sentence and the seriousness of the offense. (*See In re Ramirez* (2001) 94 Cal.App.4th 549, 570–571 [114 Cal.Rptr.2d 381] [in conducting parole proportionality analysis, the court considers the gravity of the offense in relation to the time in prison already served].) Under this circumstance, the justification for denying his parole would become less clear, even under the deferential "some evidence" standard. Thus, future denials of petitioner's parole may warrant judicial reappraisal.
> *Rosenkrantz*, 29 Cal.4th at 689–690, 128 Cal. Rptr.2d 104, 59 P.3d 174 (Moreno, J., concurring).

6. Justice Vogel dissented, explaining that since petitioner had by then served the minimum sentence for first degree murder (a crime of which he was acquitted), the BPT should consider whether his offense was especially egregious for a first degree murder as opposed to a second degree murder. Justice Vogel also stated that he believed the petition should be granted because there was *"no evidence"* supporting the Board's decision. [Petitioner's Ex. H (emphasis in original)].

7. Justices Kennard and Moreno, however, opined that the petition should be granted. [Petitioner's Ex. I].

### The BPT's decision

The BPT began the January 5, 2004 hearing by reciting the facts surrounding the commitment offense. Those facts, which are not in dispute, are as follows:

At the time of the offense, petitioner was 18 years of age and resided with his parents and two brothers in Calabasas in Los Angeles County. Petitioner testified that he knew at an early age that he was gay but also knew that this circumstance was unacceptable to his family—particularly to his father, whom he idolized. Petitioner pretended to be heterosexual but secretly was able to communicate with and meet other gay teenagers. Petitioner's brother Joey, then 16 years of age, suspected that petitioner was gay and shared this suspicion with Steven Redman, Joey's 17-year-old friend. According to petitioner, Redman was a bully and was preoccupied with hatred of homosexuals, and Joey also disliked such individuals.

By eavesdropping on petitioner's telephone conversations, Joey learned that petitioner planned to meet another young male at the family's beach house on the evening petitioner graduated from high school—Friday, June 21, 1985. Redman suggested that he and Joey go to the beach house that night to investigate and gather information concerning petitioner's sexual orientation. Upon arriving at the beach house, Redman and Joey looked through a window and observed petitioner, two other males, and one female drinking and watching television.

When petitioner and his male companion entered a bedroom, and Joey and Redman no longer could view petitioner's activities, Joey wanted to leave. Redman, however, decided that he would run into the house and take photographs. Before he did so, Redman and Joey retrieved a flashlight and a stun gun from Joey's automobile. Joey unlocked the door to the house and Redman kicked it in, shouting, "Get the fuck out of here you faggots." A physical confrontation ensued in which Joey burned petitioner's hands by firing the stun gun, Redman struck petitioner several times with the flashlight, petitioner's companion punched Redman, and petitioner burned Joey on the face after having gained control of the stun gun. Petitioner's nose was broken during the altercation.

The fighting ceased when petitioner's other friends intervened, but petitioner then obtained a BB gun from his automobile and attempted to prevent Redman and Joey from leaving the house. Joey stated that he had recorded telephone calls confirming petitioner's homosexuality, and that the tapes were in his automobile. Joey managed to escape when petitioner accompanied him to retrieve the tapes. Because petitioner had taken the keys to Joey's automobile, however, Joey telephoned their father, who drove to the beach house and spoke with petitioner. Petitioner surrendered Joey's keys to his father. Before Redman and Joey left, Redman stated to petitioner's father that he and Joey had observed petitioner with another male who had his pants down.

The next morning, petitioner insisted to his father that he was heterosexual and that Redman and Joey had lied. Petitioner's father, very upset by the possibility that petitioner might be gay, broke down and cried during the conversation with petitioner. Petitioner and Joey had decided that Joey would inform their father that the entire incident had been a joke, and Joey recanted his story concerning petitioner's homosexual conduct. Redman, having been summoned by the boys' father, modified his story regarding what he had observed

the previous evening, but petitioner's father gradually realized that petitioner was gay. He confronted petitioner and angrily questioned him regarding his activities and contacts. Petitioner gathered his possessions and left the house, sleeping in his automobile that night.

On Monday, June 24, petitioner went to a shooting range and rented an Uzi semiautomatic nine-millimeter carbine. Petitioner testified that he had planned to kill himself at the shooting range, but then decided to use the gun to teach Redman a lesson. After shooting the weapon on the firing range for 10 or 15 minutes, petitioner stated to the manager that he wished to purchase an Uzi and did not want to wait for it to be ordered. When the manager refused to sell him the weapon he had rented, petitioner left. Also on Monday, petitioner visited a sporting goods store and arranged to purchase an Uzi that would be available on Wednesday, June 26.

Petitioner was employed at a restaurant and worked there during this period. On Tuesday, June 25, petitioner stated to a coworker that he had purchased a gun and was planning to kill his brother. Petitioner also informed another coworker that Redman and Joey had humiliated petitioner and that he was obtaining a gun.

On Wednesday, June 26, petitioner obtained the Uzi he had ordered and purchased 250 rounds of ammunition. Petitioner testified that he telephoned Redman that night, but Redman hung up on him. Petitioner thought that he might use the Uzi to force Redman to recant what he had told petitioner's father regarding petitioner's sexual activities. On Thursday, having telephoned two individuals who knew Redman, petitioner succeeded in learning where Redman resided. Petitioner again telephoned Redman, who refused to recant his statements regarding petitioner's sexual orientation.

On Thursday night, petitioner traveled to the condominium complex where Redman resided and unsuccessfully attempted to locate Redman's vehicle. Petitioner spent the night in his own automobile near the complex. The next morning, June 28, when Redman was driving away from his home, petitioner used his vehicle to block Redman's vehicle and confronted Redman, who asked petitioner what he wanted. Holding the Uzi, which was loaded and ready to be fired, petitioner responded, "I think you know what I want." According to petitioner, Redman called him a "faggot" and said petitioner was in a lot of trouble. Petitioner twice asked Redman to accompany him to petitioner's home to recant what Redman had said. Redman responded, "I'm not going anywhere with you, you goddam faggot." When Redman asked petitioner what he was going to do with the weapon, petitioner stated that he was going to use it to damage Redman's car. Redman reiterated that he would not go anywhere with petitioner. Petitioner then pointed the gun at Redman and began shooting. Redman sustained at least 10 gunshot wounds, including six wounds to the head. There was evidence that the Uzi had been fired at very close range. Redman died from the shooting.

Petitioner walked away from the body and entered his vehicle, still pointing the weapon at Redman. In a telephone conversation that morning with Joey, petitioner cried and stated that he had done something terrible to Redman. That evening, petitioner telephoned a deputy sheriff who also had been petitioner's teacher at school. In this conversation, which was recorded, petitioner admitted the shooting and expressed attitudes ranging from remorse to defiance.

In the weeks following the shooting incident, petitioner traveled to various towns in northern California and Oregon, spending time with friends. Approximately one month after the shooting, petitioner, accompanied by his attorney, surrendered to the investigating deputy sheriff.

*Rosenkrantz,* 29 Cal.4th at 627–629, 128 Cal.Rptr.2d 104, 59 P.3d 174. [*See* Petitioner's Ex. A at 11–13].

The BPT next reviewed petitioner's background, noting that petitioner had no criminal record, a stable social history, and no history of drug or alcohol use. [Petitioner's Ex. A at 33, 38–42]. The BPT detailed petitioner's institutional adjustment, noting that petitioner had received a vocational certificate in welding in 2003. [Petitioner's Ex. A at 43–45]. The BPT noted that petitioner had "always done very, very well," and had received "exceptional work reports." [Petitioner's Ex. A at 46]. Petitioner had earned an A.A. degree from Chapman College in 1992, and a B.S. degree is computer science form Columbia Southern University in 1998. [Petitioner's Ex. A at 47]. Petitioner had received proficiency certificates for word processing, data processing, and computer skills. [Petitioner's Ex. A at 48]. Petitioner had participated successfully in numerous self-help programs, dating from 1993, including Project Change, Anger Management, Rational Therapy, Self–Esteem, the "ACT" program, Drug and Alcohol Prevention, and HIV Prevention. [Petitioner's Ex. A at 49–50]. Petitioner also had "done a tremendous amount of work for the institution in terms of software development," and had received "many laudatory chronos" for his work. In particular, petitioner developed software programs to track sexually violent predators, INS inmates, disabled inmates, and the prison substance abuse program. One laudatory chrono petitioner received indicated that "the work [petitioner] did for the in-mate trust account activity resulted in the breakup of a ring of inmates bringing narcotics into the institution." [Petitioner's Ex. A at 50]. As the BPT put it, "the institution has greatly benefitted from [petitioner's] education. And we can see that [petitioner has] tried to give back in this way." [Petitioner's Ex. A at 50]. Petitioner also received a laudatory chrono for his participation in the Literacy Council. Further, petitioner was involved in the Inmate Peer Educator program. Finally, on December 25, 2001, petitioner saved the life of an inmate who was choking on a piece of meat, by performing the Heimlich maneuver. [Petitioner's Ex. A at 51].

The BPT commended petitioner for having no record of discipline in prison. [Petitioner's Ex. A at 51].

The BPT next reviewed petitioner's latest psychological evaluation, which, like every prior evaluation, was favorable. [*See* Petitioner's Ex. F]. In particular, the evaluation reported that:

Mr. Rosenkrantz has developed substantial insight into the factors contributing to the instant offense. The instant offense appears to be an isolated incident.... It appears that during this short interval of time lasting less than one week Mr. Rosenkrantz experienced a level of stress which was sufficient to override both his emotional and behavioral control. It seems very unlikely, given his current level of maturity, that such a sequence of events would likely recur. He continues to express appropriate feelings of remorse for the victim.

[Petitioner's Ex. A at 57–58]. In terms of an assessment of future dangerousness, Dr. Rueschenberg opined that petitioner is clearly not a criminally oriented individual and with the exception of the instant offense he does not have a history of violent behavior either within the community or in prison. His score on

the HARE scale places him in a very low range indicating a very low risk for future violence.

[Petitioner's Ex. A at 58–59]. As the BPT summarized the medical evidence, petitioner posed "virtually no threat to the public" if released from prison. [Petitioner's Ex. A at 60].

The BPT inquired about petitioner's parole plans. Petitioner's parents had offered to house petitioner in their home in Calabasas, California. [Petitioner's Ex. A, at 61]. Petitioner had a job offer from the Greenspan Company to perform computer work. [Petitioner's Ex. A at 62–63]. Petitioner also had income from property of about $4,500 a month, so he had the means to support himself. [Petitioner's Ex. A at 63–64].

Petitioner received numerous letters of support, including from members of the public, Assemblywoman Jackie Goldberg, State Senator Sheila James Kuehl, and Superior Court Judge Albracht, who presided over petitioner's trial. [Petitioner's Ex. A at 67–71]. Captain Frank Merriman of the Los Angeles Sheriff's Department sent a letter opposing petitioner's parole. [Petitioner's Ex. A at 71–72]. Finally, a deputy district attorney indicated that the District Attorney of Los Angeles opposed parole. [Petitioner's Ex. A at 88–98].[8]

After considering this evidence, the panel found petitioner unsuitable for parole. The panel offered the following explanation for its decision:

> The offense was carried out in an especially cruel and callous manner. This was a planned assault on the victim. The prisoner lied [sic] in wait, waited outside of his home until the—until the victim, Mr. Redman, came out, and then he shot him, not once, but repeatedly, at least 10 times with an Uzi. The offense was carried out in a dispassionate and a calculated manner such as an execution style murder. And we say that knowing that this was a second degree murder. But the four shots that was [sic] fired into the victim as he laid helpless on the street certainly in the mind of his [sic] Commission indicates that is was an execution style murder. And with that we note the victim was abused. Any time a victim is shot 10 times certainly we consider that abusive. The offense was carried out in a manner that demonstrates a total callous disregard for another human being or for the suffering of a human being or a callous disregard for the laws and rules that's [sic] established for an organized—a well ordered society, an Uzi in an urban area. The motive for the crime is inexplicable. The conclusions were drawn from the Statement of Facts wherein the prisoner apparently had an altercation with the victim and his brother in which he was eventually—Mr. Rosenkrantz was eventually, for lack of a better word, outed as a homosexual. And this was— this information was conveyed to the prisoner's father and as a result this caused some turmoil in the home and apparently the prisoner left the home as a result and he was—in an attempt to get his brother and the victim, Mr. Redman, to recant their statements the prisoner planned this assault. He went to a firing range, he practiced, he—he attempted to purchase an Uzi. And the first time he was not successful. He tried again and he eventually was successful in purchasing an Uzi. He bought numerous rounds of ammunition for this weapon. And on the day of the offense he waited outside the victim's home until

---

8. The Sheriff's Department and the District Attorney's Office previously had not opposed granting petitioner parole, but both reversed position. The record reflects no reason for this reversal. [See Petitioner's Ex. D at 3–4].

the victim came out. And when he came out, he encountered him and at least 10 rounds was [sic] fired, four of which was [sic] while the victim was laying on the ground, it was in the victim's head. The prisoner had no previous occasion of inflicting injury on a victim. He had no record of violent behavior. In fact, the prisoner had no juvenile record, nor did he have an adult record. He had no history of any kind of criminality. Now in terms of an unstable social history or prior—Prior criminality we already talked about. But in terms of unstable social history, there's no indication that the prisoner had an unstable social history. Quite to the contrary. Everything I can read indicate [sic] that the prisoner had a stable social history. Both parents was [sic] in the home. It appeared that he grew up in a loving home. So there's no indications that— He did well in school. He was accepted to college. So there was no indication of an unstable social history. Now, the prisoner has programmed. The prisoner has programmed in a commendable manner. A recent psychological report—The most recent psychological report, August of '99, by Dr. Rueschenberg, R–U–E–S–C–H–E–N–B–E–R–G, it says that the prisoner's assessment of dangerousness is low. Dr. Lance Portnoff, P–O–R–T–N–O–F–F, completed a report in—on 8–1988, good report, shows that his level of dangerousness in the community is reduced. Certainly we feel that the prisoner has realistic parole plans. He have [sic] a very loving relationship with his parents apparently, and he have [sic] residential plans and he have [sic] means of employment. And certainly we feel that with his welding skill and with his computer skills and with his B.A. Degree in computers that he have [sic] the means of supporting himself. He have [sic] marketable skill should he be released. The hearing

Panel notes that in response to Penal Code 3042 Notices indicating opposition to a finding of parole suitability, specifically one, the Deputy District Attorney made a very compelling argument against suitability, from Los Angeles. There's also a letter in the file from the Los Angeles Sheriff's Department— Sheriff Department in opposition of a finding of suitability. The Panel makes the following findings. The Panel finds that the prisoner have [sic] made phenomenal progress. That he needs to continue in the mode that he's in, continue to participate in self-help programs and other kinds of programs, the kinds of programs that would enable him to be able to face, discuss, understand and cope with stressful situations such as the offense, the commitment offense, the kind that brought him to prison, in a nondestructive manner. We feel he's making progress in this area. Undoubtedly he will reach a point sometime in the near future where he will be found suitable again. Until some Panel feels that the prisoner have [sic] made enough progress, the Board still finds that there is a certain amount of unpredictability there and therefore the possibility of threat to others. Nevertheless, we certainly need to commend the prisoner for hi outstanding behavior in prison. No disciplinaries, no 128 chronos, a B.A. Degree from Columbia in computer science, an A.A. Degree from Chapman, he was already a high school grad when he came to prison, gets good work reports. Apparently he worked as a literacy counsel for the inmates. He works on computer programs for the institutional staff and they've wrote [sic] him good chronos. Somewhere in the file, as it was articulated, he even saved an inmate's life by using the Heimlich maneuver. So certainly all of those things point to suitability. However, those positive aspects of his behavior does not

[sic] outweigh the fact of unsuitability. The prisoner's parole is going to be denied for one year. And the Panel recommends that he remain disciplinary-free, that he continue to participate in self-help programs. Now this one year denial, certainly the crime had a lot to do with that, the manner in which the prisoner carried out the crime, the gravity of the offense certainly weighed heavy on the minds of the Panel members. Certainly—And speaking of the gravity of the offense, the manner in which the prisoner purchased the weapon, trained himself to use the weapon, approached his victim, shot his victim six times, then four more times as he laid [sic] on the street, certainly weighed heavy [sic] on the Board's mind. Also, the petitioner's rendition of whether or not his brother was in danger certainly weighed heavy on the Panel's mind. When I say his brother, whether or not the prisoner is actually going to do harm to him. Now, the prisoner can't change what have [sic] occurred in the past. It appears that he's doing everything to make himself suitable, but certainly in my mind today there's still some unanswered questions. And I think the prisoner is making progress. However, I still think he have [sic] some—some ways to go.

[Petitioner's Ex. A at 113–119].

## Petitioner's contentions

Petitioner alleges that he was denied due process because (1) the BPT's finding that petitioner poses an unreasonable risk of danger is not supported by any evidence, since all of the evidence shows that petitioner would pose no threat to public safety if released; (2) each ground relied upon by the BPT to deny parole lacked support; (3) the BPT relied solely upon petitioner's commitment offense; (4) petitioner's commitment offense was not particularly egregious for a first-degree murder, and petitioner already has served the minimum term for such offense; (5) there is no nexus between petitioner's offense and petitioner's parole risk; and (6) the BPT failed to base its decision on a preponderance of the evidence or its codified suitability criteria. [Memorandum in Support of Petition at 11–27].

## Standard of review

This Court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

■ The Supreme Court has explained that section "2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning." *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor,* 529 U.S. 362, 412–413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see Lockyer v. Andrade,* 538 U.S. 63, 73–76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

█ While only Supreme Court precedent is controlling under the AEDPA, other case law is persuasive authority "for purposes of determining whether a particular state court decision is an unreasonable application of Supreme Court law." *Vlasak v. Superior Court of California ex rel. County of Los Angeles*, 329 F.3d 683, 687 (9th Cir.2003) (quoting *Luna v. Cambra*, 306 F.3d 954, 960 (9th Cir.2002) (internal quotation marks and citation omitted), *amended*, 311 F.3d 928 (9th Cir.2002)); *see Bruce v. Terhune*, 376 F.3d 950, 956 (9th Cir.2004) ("Although only the Supreme Court's precedents are binding on state courts under AEDPA, our precedents may provide guidance as we review state-court determinations.").

█ Where, as here, a higher state court has denied a claim without explanation, federal courts "look through" that denial to the last reasoned state decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–806, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, n. 2 (9th Cir.2000), *cert. denied*, 534 U.S. 944, 122 S.Ct. 324, 151 L.Ed.2d 242 (2001).

### Discussion [9]

█ The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law. A person alleging a due process violation must first demonstrate that he or she was deprived of a liberty or property interest protected by the Due Process Clause, and then show that the procedures that led to the deprivation were not constitutionally sufficient. *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 459–460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir.2002).

█ In the parole context, a prisoner alleging a due process claim must demonstrate the existence of a protected liberty interest in parole, and the denial of one or more of the procedural protections that must be afforded when a prisoner has a liberty interest in parole. The Supreme Court held in 1979, and reiterated in 1987, that "a state's statutory scheme, if it uses mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest." *McQuillion*, 306 F.3d at 901 (citing *Greenholtz v. Inmates of Nebraska Penal*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) and *Board of Pardons v. Allen*, 482 U.S. 369, 373, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987)).[10] The Ninth Circuit has held that

---

**9.** It appears that petitioner had a parole hearing after the decision challenged in this petition. [Memorandum in Support of Petition at 22 n. 11 (noting that petitioner was denied parole on April 25, 2005)]. This subsequent parole denial does not render this petition moot. First, petitioner is still in custody as a result of the 2004 decision, the decision he challenges in this petition. Second, petitioner's claims challenging the denial of parole fall within the "capable of repetition yet evading review" exception to mootness. *See Hubbart v. Knapp*, 379 F.3d 773, 777 (9th Cir. 2004) (habeas petition challenging a two-year commitment under California's Sexually Violent Predator Act was found to "evade review" because the duration of the commitment was too short to be fully litigated prior to its expiration), *cert. denied*, 543 U.S. 1071, 125 S.Ct. 913, 160 L.Ed.2d 807 (2005).

**10.** Respondent argues that in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court criticized the mandatory language methodology described in *Greenholtz* and *Allen*, and that under *Sandin*, California has not created a protected liberty interest in parole. [Answer at 8–10]. The Ninth Circuit, however, has rejected that argument, explaining that *Sandin*'s holding is limited to internal prison disciplinary regulations. *McQuillion*, 306 F.3d at 903.

California's parole scheme creates a cognizable liberty interest in release on parole because Penal Code § 3041 uses mandatory language and is similar to the Nebraska and Montana statutes addressed in *Greenholtz* and *Allen,* respectively. *McQuillion,* 306 F.3d at 901–902. As the Ninth Circuit has explained, "Section 3041 of the California Penal Code creates in every inmate a cognizable liberty interest in parole which is protected by the procedural safeguards of the Due Process Clause," and that interest arises "upon the incarceration of the inmate." *Biggs v. Terhune,* 334 F.3d 910, 914–915 (9th Cir.2003).

Respondent contends that *McQuillion* is no longer good law because of an intervening decision of the California Supreme Court. [Answer at 5–8]. It is true, of course, that after the Ninth Circuit's decision in *McQuillion,* the California Supreme Court addressed a portion of the California parole statute. That decision, however, does not mean what respondent says it means, and it does not undercut *McQuillion.* In *In re Dannenberg,* 34 Cal.4th 1061, 23 Cal.Rptr.3d 417, 104 P.3d 783 (2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 92, 163 L.Ed.2d 109 (2005) the California Supreme Court held that the BPT need not engage in a "uniform term" analysis under section 3041(a) if it determines that public safety concerns warrant denial of parole under section 3041(b). *Dannenberg,* 34 Cal.4th at 1082–1094, 23 Cal. Rptr.3d 417, 104 P.3d 783. The court did not hold that there is no protected liberty interest in parole whatsoever. It simply held that the BPT was not required to compare one inmate's parole suitability with the parole suitability determinations given to other inmates who had been convicted of similar crimes, at least under some circumstances. *See Dannenberg,* 34 Cal.4th at 1098 n. 18, 23 Cal.Rptr.3d 417, 104 P.3d 783. Indeed, California courts have continued to analyze claims regarding denial of parole under due process stan-dards, even after *Dannenberg. See In re Shaputis,* 135 Cal.App.4th 217, 224, 231–232, 37 Cal.Rptr.3d 324 (2005) (citing *Dannenberg* and granting habeas relief because there was no evidence supporting the BPT's reliance on the prisoner's former alcoholism-related violence toward his marital partner); *In re Scott,* 133 Cal. App.4th 573, 34 Cal.Rptr.3d 905 (2005) (citing *Dannenberg* and granting habeas relief because "some evidence" did not support the Governor's finding that the circumstances of the murder made him unsuitable for parole). Moreover, even in *Dannenberg* itself, the California Supreme Court reached the issue whether there was "some evidence" supporting the parole suitability determination, thus indicating that due process requirements still apply to parole determinations in California. *Dannenberg,* 34 Cal.4th at 1095–1096, 23 Cal.Rptr.3d 417, 104 P.3d 783.

Furthermore, *Dannenberg*'s holding is limited to the uniform term provision of section 3041(a). The Ninth Circuit, in reaching its determination that the California parole scheme creates a liberty interest protected by the Due Process Clause, only considered the language of section 3041(b). *McQuillion,* 306 F.3d at 902. Because the California Supreme Court did not reinterpret section 3041(b), and because the reasoning in *McQuillion* is based solely on section 3041(b), *Dannenberg* does not undermine the Ninth Circuit's decision. Therefore, the Ninth Circuit's holding in *McQuillion* that the mandatory language of section 3041(b) creates a liberty interest in parole remains controlling precedent. *See, e.g., Blankenship v. Kane,* 2006 WL 515627, *3 (N.D.Cal.2006)(holding that "[b]ecause the Ninth Circuit specifically held in *McQuillion* that California's parole scheme creates a federally protected liberty interest, and because *Dannenberg* did not address this issue, the Court rejects Respondent's

argument that there is no protected liberty interest in parole for California inmates."); *Machado v. Kane*, 2005 WL 3299885, *2 (N.D.Cal.2005) (discussing *Dannenberg* and concluding that "[t]his Section 3041 requirement to grant parole except under certain circumstances creates a cognizable liberty interest in parole which is protected by the procedural safeguards of the Due Process Clause for every eligible inmate.") (citing *Biggs*, 334 F.3d at 913–915); *Murillo v. Perez*, 2005 WL 2592420, at *3, n. 1 (C.D.Cal.2005) (holding that *Dannenberg* did not undercut the law as set forth in *McQuillion* ); *Saifullah v. Carey*, 2005 WL 1555389, at *8 (E.D.Cal.2005) (finding a liberty interest in parole in California post-*Dannenberg* ); *Thompson v. Carey*, 2005 WL 3287503, *4 (E.D.Cal.2005) (same); *Devries v. Schwarzenegger*, 2005 WL 2604203, *3–4 (E.D.Cal.2005) (same); *but see Sass v. Cal. Bd. of Prison Terms*, 376 F.Supp.2d 975, 982 (E.D.Cal.2005) (holding that given the California Supreme Court's decision in *Dannenberg*, there is no liberty interest in parole in California).[11]

Nevertheless, because parole proceedings are not part of the criminal prosecution, the full panoply of rights due a defendant in a criminal proceeding is not constitutionally mandated. *Jancsek v. Oregon Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir.1987). Instead, the due process rights that flow from a liberty interest in parole are limited: the prisoner must be provided with notice of the hearing, an opportunity to be heard, and if parole is denied, a statement of the reasons for the denial.[12] *Greenholtz*, 442 U.S. at 16, 99 S.Ct. 2100; *Jancsek*, 833 F.2d at 1390 (citing *Greenholtz*, 442 U.S. at 16, 99 S.Ct. 2100); *see also Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (describing the procedural protections due in the parole context). In addition, due process requires that "some evidence" support the parole board's determination, and that the evidence relied upon must possess "some indicia of reliability." *Biggs*, 334 F.3d at 915; *see McQuillion*, 306 F.3d at 904; *Jancsek*, 833 F.2d at 1390 (adopting the "some evidence" standard set forth by the Supreme Court in *Superintendent v. Hill*, 472 U.S. 445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985));[13] *see also Caswell v. Calderon*, 363 F.3d 832, 839 (9th Cir.2004). The "some evidence" standard is satisfied if there is any reliable evidence in the record that could support the conclusion reached. *Powell v. Gomez*, 33 F.3d 39, 40 (9th Cir. 1994) (citing *Hill*, 472 U.S. 445, 455–456,

11. The district judge who decided *Sass* may have later repudiated his own decision. *See Bair v. Folsom State Prison*, 2005 WL 2219220, *12 n. 3 (E.D.Cal.2005), *report and recommendation adopted by*, 2005 WL 3081634, *1 (E.D.Cal.2005).

12. Petitioner does not allege that he was denied notice of the parole hearing, an opportunity to be heard, or a statement of the reasons for the denial of parole suitability. In fact, the record reflects that he received each of these procedural protections.

13. In *Hill*, the Supreme Court stated that
[i]n a variety of contexts, the Court has recognized that a governmental decision resulting in the loss of an important liberty interest violates due process if the decision is not supported by any evidence. *See, e.g., Douglas v. Buder*, 412 U.S. 430, 432, 93 S.Ct. 2199, 37 L.Ed.2d 52 (1973) (per curiam) (revocation of probation); *Schware v. Board of Bar Examiners*, 353 U.S. 232, 239, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (denial of admission to bar); *United States ex rel. Vajtauer v. Commissioner of Immigration*, 273 U.S. 103, 106, 47 S.Ct. 302, 71 L.Ed. 560 (1927) (deportation).
*Hill*, 472 U.S. at 455, 105 S.Ct. 2768. The Supreme Court then held that "the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits." *Hill*, 472 U.S. at 455, 105 S.Ct. 2768.

105 S.Ct. 2768 and *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir.1987)). Finally, determining whether the "some evidence" standard was met does not require examination of the entire record, independent assessment of the credibility of witnesses, or the weighing of evidence. *Toussaint v. McCarthy*, 801 F.2d 1080, 1105 (9th Cir. 1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).

### Application to petitioner's case

 The BPT offered only one reason for its decision finding petitioner unsuitable for parole: the egregiousness of petitioner's commitment offense. Based upon the gravity of the offense, the BPT found that petitioner would pose an unreasonable risk of danger if released. The BPT characterized petitioner's offense as "inexplicable," and as having been carried out "in an especially cruel and callous manner" and "in a dispassionate and calculated manner such as an execution style murder." It added that "the victim was abused," and that "the motive for the crime is inexplicable." [Petitioner's Ex. A at 113–114]. The Superior Court, which offered the last reasoned decision on petitioner's claim, concluded that the BPT's finding that offense was "more aggravated than the minimum necessary to sustain a conviction for second-degree murder" was supported by some evidence.[14] [Petitioner's Ex. G]. The Superior Court did not detail what evidence is considered in reaching that conclusion. This was at least the fifth time that the BPT (or a state court reversing a BPT panel's grant of parole), denied parole based upon the unchanging facts of petitioner's commitment offense.

In *Biggs*, the Ninth Circuit stated that although reliance on the nature of a prisoner's offense may satisfy the "some evidence" requirement, continued reliance on an unchanging factor such as the circumstances of the offense could result in a due process violation if the prisoner continually demonstrates exemplary behavior and evidence of rehabilitation. *Biggs*, 334 F.3d at 916. Biggs was serving a sentence of twenty-five years to life following a 1985 first degree murder conviction. In what

14. Respondent argues that the BPT's decision rested upon another ground: the opposition of the District Attorney and the Sheriff's Department. That argument is flawed. First, the BPT did not purport to deny parole on this ground; rather, the BPT simply noted the opposition. [*See* Petitioner's Ex. A at 116]. Second, the Superior Court did not decide that the opposition of these agencies amounted to some evidence supporting the BPT's decision. Third, both the District Attorney and the Sheriff's Department opposed parole based solely upon their view of the gravity of the offense, so their oppositions are merely cumulative of the BPT's own determination regarding the callousness of the crime. *See* Petitioner's Ex. A at 72 & Respondent's Lodged Doc. 2, Ex. 3 (letter from Captain Merriman of Sheriff's Department reiterating the facts of the crime and stating that "[i]t is the opinion of this department that parole of inmate Rosenkrantz is inappropriate and should be denied."), Ex. A at 88–98 (Deputy District Attorney arguing that the offense "is a cold blooded, execution style killing over a week's time of preparation that shocks the conscience. And for that reason alone, as supported by the Supreme Court, we would ask for a denial of parole."). Fourth, both the District Attorney and the Sheriff's Department had previously not opposed granting petitioner parole. Nothing about petitioner's case for release on parole changed for the worse between the time when the District Attorney and the Sheriff's Department supported release on parole and the time when they opposed it. To the contrary, the facts of petitioner's crime have been fully developed for more than a decade, while with each passing year, additional evidence demonstrating his suitability for parole has accumulated, most importantly, perhaps, his continued perfect performance in prison and favorable psychological reports indicating that he would pose no danger to the community if he were released on parole. In these circumstances, reliance on the opposition of these agencies would be arbitrary.

appears to have been Biggs's first parole suitability hearing in 1999, the BPT found him unsuitable for parole despite his record as a model prisoner. *Biggs,* 334 F.3d at 913. Biggs claimed that the BPT's determination deprived him of due process because it was not supported by any evidence. While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs unsuitable for parole, it upheld three: (1) Biggs's commitment offense involved the murder of a witness; (2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; and (3) Biggs could benefit from additional therapy. *Biggs,* 334 F.3d at 913. Nevertheless, the Ninth Circuit cautioned the BPT about continued reliance on the gravity of the commitment offense and Biggs's conduct prior to the commitment offense.

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest.

*Biggs,* 334 F.3d at 916. The Ninth Circuit added that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." *Biggs,* 334 F.3d at 917.

One district court has explained the rationale underlying this aspect of *Biggs* as follows:

> Whether the facts of the crime of conviction, or other unchanged criteria, affect the parole eligibility decision can only be predicated on the "predictive value" of the unchanged circumstance. Otherwise, if the unchanged circumstance per se can be used to deny parole eligibility, sentencing is taken out of the hands of the judge and totally reposited in the hands of the BPT. That is, parole eligibility could be indefinitely and forever delayed based on the nature of the crime even though the sentence given set forth the possibility of parole—a sentence given with the facts of the crime fresh in the mind of the judge. While it would not be a constitutional violation to forego parole altogether for certain crimes, what the state cannot constitutionally do is have a sham system where the judge promises the possibility of parole, but because of the nature of the crime, the BPT effectively deletes such from the system. Nor can a parole system, where parole is mandated to be determined on someone's future potential to harm the community, constitutionally exist where despite 20 or more years of prison life which indicates the absence of danger to the community in the future, the BPT commissioners revulsion towards the crime itself, or some other unchanged circumstance, constitutes the alpha and omega of the decision. Nobody elected the BPT commissioners as sentencing judges. Rather, in some realistic way, the facts of the unchanged circumstance must indicate a present danger to the community if released, and this can only be assessed not in a vacuum, after four or five eligibility hearings, but counterpoised against the backdrop of prison events.

*Bair v. Folsom State Prison,* 2005 WL 2219220, *12 n. 3 (E.D.Cal.2005), *report and recommendation adopted by,* 2005 WL 3081634 (E.D.Cal.2005).

In the circumstances of this case, the BPT's continued reliance upon the nature of petitioner's crime to deny parole in 2004

violated due process. First, continued reliance upon the unchanging facts of petitioner's crime makes a sham of California's parole system and amounts to an arbitrary denial of petitioner's liberty interest. Petitioner had been denied parole on six occasions prior to the determination he now challenges. Continued reliance upon the unchanging characterization of petitioner's offense amounts to converting petitioner's sentence of seventeen years to life to a term of life without the possibility of parole. As one court has put it:

> The court asks rhetorically—what is it about the circumstances of petitioner's crime or motivation which are going to change? The answer is nothing. The circumstances of the crimes will always be what they were, and petitioner's motive for committing them will always be trivial. Petitioner has no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious or the motive was more than trivial. Given that no one seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point of non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility.

*Irons v. Warden of California State Prison—Solano,* 358 F.Supp.2d 936, 947 (E.D.Cal.2005), *appeal docketed,* 408 F.3d 1165 (9th Cir.2005).

The arbitrariness of the decision in petitioner's case is highlighted by the flip-flopping characterizations of petitioner's crime by different BPT panels and the unexplained reversals in the opinions of the District Attorney and the Sheriff's Department regarding petitioner's crime and its relation to his suitability for parole. In different hearings, different panels have used different parts of the regulations to describe petitioner's crime. Some of these characterizations are inaccurate and lack any support in the record. For example, there is no dispute that petitioner extremely emotionally upset by Redman's attack upon him at the beach house and subsequent revelation of petitioner's homosexuality to petitioner's father. As the California courts have concluded, an "inexplicable motive" is "one that is unexplained or unintelligible, as where the commitment offense does not appear to be related to the conduct of the victim and has no other discernable purpose." *In re Scott,* 119 Cal.App.4th 871, 892–893, 15 Cal.Rptr.3d 32 (2004). To call petitioner's crime "inexplicable," as the BPT has [*See* Petitioner's Ex. A at 113–119], contradicts all of the evidence in the record. In fact, as the first panel granting parole concluded and as every psychological examination performed on petitioner has confirmed, petitioner's crime was the result of significant emotional stress in his life, a factor that actually weighs in favor of a finding of parole suitability. 15 Cal.Code Regs. § 2402(d)(4). *See Scott,* 133 Cal.App.4th at 595–596, 34 Cal.Rptr.3d 905 (finding that the Governor erred by failing to consider in petitioner's favor the undisputed evidence that the inmate committed his offense while under emotional stress). Similarly, the statement that the crime was "especially callous" does not fit within the regulations, which provide that one factor to consider is whether "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." 15 Cal.Code Regs. § 2402(c)(1)(D). According to California appellate courts, this provision contemplates that the victim was made to suffer in some exceptional way. *See Scott,* 119 Cal.App.4th at 892, 15 Cal.Rptr.3d 32 (holding that a determination that the crime had been carried out with "exceptional disregard for human suffering" meant that it was perpetrated in an especially cruel manner with disregard for human suffering and required more than the

simple cruelty and callousness necessary to find that a defendant killed with malice); *In re Smith*, 114 Cal.App.4th 343, 366–367, 7 Cal.Rptr.3d 655 (2003) (same).[15] There is no evidence in the record supporting such a conclusion. Likewise, the statement that the victim was "abused" because he was shot ten times does not fall within the definition contained in the regulations, which provide that one relevant factor is "the victim was abused, defiled or mutilated during of after the offense." 15 Cal. Code Regs. § 2042(c)(1)(C). *Cf. Maurer v. Calderon*, 1997 WL 446229, *2 (N.D.Cal. 1997) (finding that the record contained some evidence supporting the BPT's finding that the victim had been "abused, defiled or mutilated" during the offense, where the victim was stabbed in the abdomen and the victim's face was slashed with a hunting knife during the course of an attempted robbery but before the victim was fatally shot). When considered as a whole, the shifting characterizations and conflicting decisions of the BPT demonstrate that its determination that petitioner's offense was exceptionally callous such that it rendered petitioner an unreasonable risk of danger was arbitrary and based entirely on the subjective lay opinions of the panel members.

Second, in this case, the circumstances of petitioner's crime do not amount to some evidence supporting the conclusion that petitioner poses an unreasonable risk of danger if released. As discussed, "[i]n the parole context, the requirements of due process are met if some evidence supports the decision." Significantly, the evidence underlying the decision must be supported by "some indicia of reliability." *Biggs*, 334 F.3d at 914 (internal quotations omitted); *Caswell*, 363 F.3d at 839; *see Hill*, 472 U.S. at 455–456, 105 S.Ct. 2768. Otherwise, it does not constitute "some evidence." *See* Gerald L. Neuman, The Constitutional Requirement of "Some Evidence", 25 San Diego L.Rev. 631, 663–664 (1988) (noting that "[e]vidence that the respondent was alive at the time in ques-

---

**15.** In *Smith*, the court reversed a parole denial which had been based, in part, on a determination the inmate's crime had been carried out with "exceptional disregard for human suffering." The appellate court observed that since second degree murder requires express or implied malice, all second degree murders by definition involve some degree of cruelty and callousness. Since a conviction for second degree murder does not automatically make a person unsuitable for parole, a determination that the crime was cruel or callous must mean that it was perpetrated in an especially cruel manner or with exceptionally callous disregard for suffering. *Smith*, 114 Cal. App.4th at 366–367, 7 Cal.Rptr.3d 655. In *Smith*, the defendant became enraged at his wife when she told him she no longer wanted to see him. He grabbed a gun and shot her three times in the head. Although the evidence supported the conclusion that the crime was cruel and callous, the state court rejected the suggestion that it supported a finding that defendant had acted with especially callous disregard for the victim's suffering. *Smith*, 114 Cal.App.4th at 366–367, 7 Cal.Rptr.3d 655. In *Scott*, the court reached the same conclusion. It determined that the evidence did not support a finding that the crime was carried out with exceptionally callous disregard for human suffering. The defendant in *Scott* had gone looking for his wife and found her at her lover's house affectionately hugging him. When the wife's lover confronted Scott, Scott warned him that he would shoot. Scott then fired two or three rounds, which struck the victim in the head and thigh. Scott immediately left the scene. *Scott*, 119 Cal.App.4th at 878, 15 Cal.Rptr.3d 32. The appellate court concluded that there was no evidence that Scott "tormented, terrorized, or injured [his victim] before deciding to shoot [him], or that he gratuitously increased or unnecessarily prolonged [his] pain and suffering.... Was the crime callous? Yes. However, are the facts of the crime some evidence that [he] acted with exceptionally callous disregard for [the victim's] suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No." *Scott*, 119 Cal.App.4th at 892, 15 Cal.Rptr.3d 32 (citation omitted).

tion is usually relevant to any charge against her. The [due process] protection of the 'some evidence' requirement demands more than that—less than legal 'sufficiency' of evidence, but more than a trivial charade.").

As it is required to do, the BPT considered whether petitioner was suitable for parole—that is, whether he presented an unreasonable risk of danger to society if released. *See* Cal.Penal Code § 3041(b); 15 Cal.Code Regs. § 2402. The BPT determined that petitioner posed an unreasonable risk of danger (and, therefore, was unsuitable for parole) because his crime was especially heinous.[16] While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances—after nearly two decades of incarceration and half a dozen parole suitability hearings—violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the "some evidence" standard. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil. *See Johnson v. Finn*, 2006 WL 195159 * 8 n. 3 (E.D.Cal.2006) (stating that "the seriousness of the crime had predictive value for the dangerousness of petitioner's release

for the first, second, perhaps third suitability hearing. But as the years go by, this factor loses its predictive value in light of the growing experience to the contrary (assuming petitioner's record in prison is exemplary)."); *Irons*, 358 F.Supp.2d at 947 n. 2 ("To a point, it is true, the circumstances of the crime and motivation for it may indicate a petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, after fifteen or so years in the caldron of prison life, not exactly an ideal therapeutic environment to say the least, and after repeated demonstrations that despite the recognized hardships of prison, this petitioner does not possess those attributes, the predictive ability of the circumstances of the crime is near zero."). Even the California courts have said as much. *Shaputis*, 135 Cal. App.4th at 231–232, 37 Cal.Rptr.3d 324 ("The only evidence before the BPT was that [the inmate] had more than a decade of demonstrated commitment to remaining sober, and there was not a scintilla of violence in his nearly two decades of incarceration. Accordingly, the BPT's conclusion the inmate remained a danger to society, to the extent it was premised on a former lifestyle that all of the evidence showed was a historical relic, is so lacking in any medical, psychological or behavioral evidentiary support that it is arbitrary and capricious, within the deferential standards . . ."); *Scott*, 133 Cal.App.4th at 595,

---

**16.** The facts of petitioner's crime are also relevant to the BPT's setting of a parole release date. California law provides that

> The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which

the inmate was sentenced and other factors in mitigation or aggravation of the crime. Cal.Penal Code § 3041(a). Thus, the circumstances of the commitment offense are relevant to two determinations: (a) whether the petitioner is suitable for parole—i.e., does not present an unreasonable risk of danger to society if released, and (b) the appropriate length of incarceration to fairly and uniformly punish him. As evidenced by the parole dates already given to petitioner (March 30, 2000 and March 30, 2001), the BPT determined that the severity of petitioner's offense did not warrant punishment of more than 16 years.

34 Cal.Rptr.3d 905 ("The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time.").

Furthermore, the general unreliability of predicting violence is exacerbated in this case by several facts, including petitioner's young age at the time of the offense, the passage of nearly twenty years since that offense was committed, and the fact that all of the other evidence in the record clearly indicates that petitioner is suitable for parole.

The reliability of the facts of his crime as a predictor for his dangerousness is further diminished by petitioner's age at the time of the offense. Petitioner turned 18 on May 22, 1985 [see Probation Officer's Report noting petitioner's birth date as 5–22–67 ], and committed his offense one month later. While petitioner was not legally a minor, he was very close to being one.[17] As the Supreme Court recently recognized, the evidentiary/predictive value of the conduct of such a young person is diminished.

> The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." Thompson [v. Oklahoma, 487 U.S. 815, 835, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) ] (plurality opinion). Their own vulnerability and comparative lack of control over their immediate sur-

roundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. See Stanford [v. Kentucky, 492 U.S. 361, 395, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) ] (Brennan, J., dissenting). The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." Johnson [v. Texas, 509 U.S. 350, 368, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) ].

Roper v. Simmons, 543 U.S. 551, 561–562, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); see also Thompson v. Oklahoma, 487 U.S. 815, 835, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (Stevens, J.) (plurality opinion) ("[L]ess culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult. The basis of this conclusion is toto obvious to require extensive explanation. Inexperience, less intelligence and less education make a teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is more apt to be motivated by mere emotion or peer pressure than as an adult.").[18]

---

17. Petitioner was an adolescent at the time he committed the offense. See, e.g., Cornelia Pechman, Linda Levine, Sandra Laughlin & Frances Leslie, Impulsive and Self–Conscious Adolescents' Vulnerability to Advertising and Promotion, 24 J. Pub. Policy & Marketing 1 (Fall, 2005) (explaining that the conventional

view is that "adolescence is roughly synonymous with teenager, or ages 13–19," but that "many scholars argue that adolescence begins at approximately age 10 and does not end until early 20s.") (citation omitted).

18. See also Elizabeth Cauffman & Laurence Steinberg, Maturity of Judgment in Adoles-

For all of these reasons, in the circumstances of petitioner's case, the facts surrounding petitioner's crime no longer amount to "some evidence" supporting the conclusion that petitioner would pose an unreasonable risk of danger if released on parole.

Petitioner's case is exactly what *Biggs* envisioned when it stated that repeated refusals to grant a parole release date to an inmate with an exemplary post-conviction record may violate the prisoner's due process rights. *Biggs*, 334 F.3d at 913. The record is replete with evidence of petitioner's remorse and rehabilitation, including glowingly positive psychological reports, extensive self-improvement through educational and vocational advancements as well as therapy, valued service in promoting the penological goals of the prison, and nearly two decades of disciplinary-free incarceration. The evidence of petitioner's outstanding performance while incarcerated is particularly significant. As the Supreme Court has recognized, "[t]he behavior of an inmate during confinement is critical in the sense that it reflects the degree to which the inmate is prepared to adjust to parole release." *Greenholtz*, 442 U.S. at 15, 99 S.Ct. 2100. Regardless of whether the BPT ever was entitled to rely upon the commitment offense to find that this particular petitioner posed an unreasonable risk of danger and was unsuitable for parole, under these unusual circumstances, the BPT's continued reliance on the commitment offense violates due pro-

cess because it resulted in an arbitrary decision and because the facts surrounding the offense do not now constitute "some evidence" with "some indicia of reliability" of petitioner's dangerousness. *See Hill*, 472 U.S. at 455, 105 S.Ct. 2768; *Biggs*, 334 F.3d at 917; *Irons*, 358 F.Supp.2d at 947; *Masoner v. State*, 2004 WL 1080177 *1–2 (C.D.Cal.2004) ("Although the gravity of the commitment offense and other pre-conviction factors alone may be sufficient to justify the denial of a parole date at a prisoner's initial hearing, subsequent BPT decisions to deny a parole date must be supported by some post-conviction evidence that the release of an inmate is against the interest of public safety. Masoner's successful rehabilitation and spotless prison record, in combination with his having served 21 years and the type of crime usually associated with such a sentence under the Universal Terms Matrix, indicate that there is no legitimate post-conviction justification for the BPT's repeated refusal to grant him a parole date."); *see Johnson*, 2006 WL 195159 at *8 ("The characterization of petitioner's crime as an execution style-murder is accurate. However, as discussed above, the 2001 hearing was petitioner's twelfth suitability hearing. It had been 24 years since petitioner committed the murder. As found by the 2001 hearing panel, petitioner had done everything he could in prison to better himself. Under these circumstances, the nature of the offense had lost

cence: Why Adolescents May be Less Culpable than Adults, 18 Behav. Sci. & L. 741 742, 756 (2000) (reviewing literature demonstrating that a violent act committed by an adolescent poses less risk of future danger than does the commission of such an act by an adult. This is because adolescents are more prone to act impulsively than adults, and also because the proclivity to commit violent acts decreases with age and the passage of time.); Erica Beecher–Monas & Edgar Garcia–Rill, Danger at The Edge of Chaos: Predicting Violent

Behavior in a Post–Daubert World, 24 Cardozo L.Rev. 1845, 1898 (2003) ("The decrease in violence and criminal activity with age is a well-established principle of criminology."); Robert J. Sampson & John H. Laub, Understanding Desistance from Crime, 28 Crime and Justice 1, 46–48 (2001) (reviewing literature reflecting the robust finding that crime peaks in late adolescence and declines for most persons sharply during developmental transitions to adulthood).

any predictive value and the continued reliance on it to find *petitioner unsuitable* violated due process. Accordingly, the court finds that this factor was not supported by some evidence.").

Because there is no reliable evidence supporting the BPT's conclusion that petitioner is unsuitable for parole, that determination violates due process. *See Hill,* 472 U.S. at 455, 105 S.Ct. 2768. The state court's determination to the contrary was based upon an unreasonable determination of the facts in light of the evidence presented during the parole hearing and amounted to an unreasonable application of clearly established Supreme Court precedent. *See Hill,* 472 U.S. at 455, 105 S.Ct. 2768; *Taylor v. Maddox,* 366 F.3d 992, 999–1000 (9th Cir.), *cert. denied,* 543 U.S. 1038, 125 S.Ct. 809, 160 L.Ed.2d 605 (2004). Accordingly, petitioner is entitled to relief.[19] *See McQuillion,* 306 F.3d at 912 (finding that petitioner was entitled to relief where none of the four grounds for recision of petitioner's parole release date was supported by "some evidence," and therefore the decision violated due process); *Irons,* 358 F.Supp.2d at 947–951 (granting habeas relief where the BPT improperly relied upon the unchanging circumstances of the commitment offense in finding petitioner unsuitable for parole in his fifth parole suitability hearing, and also asserted that petitioner needed more therapy, a conclusion that lacked any support in the record); *Saifullah,* 2005 WL 1555389 at *13–16 (granting habeas relief where the record contained no evidence supporting the BPT's decision that petitioner was a danger to society and unsuitable for parole based upon (a) his commitment offense, (b) his prior criminal history, and (c) a rules violation which resulted when, based upon his religious beliefs, petitioner refused to cut his hair).

### Conclusion

For the foregoing reasons, the petition should be granted. Because petitioner's parole date has been twice determined under California law, and because both of those dates (March 30, 2000 and March 30, 2001) have long since passed, respondent should be directed to release petitioner on parole within thirty (30) days of the date of entry of judgment. *McQuillion v. Duncan,* 342 F.3d 1012, 1015–1016 (9th Cir. 2003) (affirming grant of relief on appeal after remand, and explaining that proper relief is immediate release rather than remand for further parole proceedings where no evidence in the record supported the BPT's determination that the petitioner was not suitable for parole); *Saifullah,* 2005 WL 1555389 at *16 ("In the absence of any evidence in the record supporting the Board's decision, remanding the case for a new hearing is futile, and the appropriate remedy is to grant the release of the petitioner.").[20]

June 26, 2006.

### JUDGMENT

It is hereby adjudged that the petition for a writ of habeas corpus is granted, and respondent is directed to release petitioner

---

**19.** Although it is not clear whether he is doing so, to the extent that petitioner alleges that he was denied his right to a parole release date under section 3041(a) or denied a parole release date that was comparable to parole release dates granted to inmates convicted of similar crimes, his claim is foreclosed by *Dannenberg* and also fails to raise a cognizable federal issue. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Further, since petitioner is entitled to relief because the BPT's decision violates due process, the Court need not address petitioner's other claims.

**20.** Nothing suggests that petitioner has committed any violent act subsequent to the BPT's 2004 hearing, so there is no reason not to require immediate release.

on parole within thirty (30) days of the date of entry of judgment.